(No. 37449.—

W. A. ROBERTSON, Successor in Trust, *et al.*, Appellees, *vs.* EASTERN LONG ISLAND HOSPITAL *et al.*—(Western Province, Community of St. Mary, Appellant.)

*Opinion filed September 27, 1963.*

ANDREWS & PETERSON, of Rockford, (WILLIAM W. PETERSON and JAMES C. SPELMAN, of counsel,) for appellant.

Thomas, Davis & Kostantacos, Guyer and Enichen, Brown, Connolly and Paddock, and Hyer, Gill and Brown, all of Rockford, (Charles H. Davis, Stanley H. Guyer, Robert Oliver, and Stanton E. Hyer, of counsel,) for appellees.

Mr. Justice Schaefer delivered the opinion of the court:

This case involves the construction of a will executed in 1882. The testatrix, Frances A. Horsman, died in 1889, leaving as her heirs at law a daughter, Mary Alice Underwood, and a granddaughter, Belle Ogden. When the will was executed and when the testatrix died Mary Alice Underwood was married and the mother of a son, John C. Underwood. Belle C. Ogden, the daughter of a deceased daughter of Frances A. Horsman, was twenty-three years of age and unmarried when the testatrix died.

The controversy involves a determination of who will take as "my heirs at law" under the residuary clause of the will, which is as follows: "One half thereof to the said Mary A. Underwood as her absolute estate; and The other one half to William T. Robertson and Rufus C. Bailey of said city of Rockford and to their successors in trust, upon the trusts following, namely; with and out of the use, rents, and profits of said trust estate,—if sufficient therefor, and if not, then out of the principal, to provide for the careful support, nurture and education of my grand-daughter Belle C. Ogden during her minority and afterwards to pay to her or for her so much as may be necessary for her proper support and living, until such time, if ever, as she shall become married and have a living child or children and then to pay and make over to her all that shall remain of said trust estate; but in case of the death of the said Belle C. Ogden before the said trust estate shall have been made over to her as aforesaid and without a living child or children, then and in that event, to pay and make over to my heirs at law all

that shall remain of said trust estate; but in case of her death before said trust estate shall have been made over to her leaving a child or children her surviving then said trust estate shall go to such child or children as her heirs at law."

Mary Alice Underwood died testate in 1924. She was survived by John C. Underwood, her only child, who died in 1949 without surviving descendants. Under the will of Mary A. Underwood her interest in the property here involved passed to a charitable trust known as "The Horsman Memorial Fund."

Belle Ogden married Joseph McKee in 1891. The parties, however refer to her as Belle Ogden, and we shall so refer to her in this opinion. She died testate in 1959 without ever having had a child born to her. Under her will, any interest she might have in a distribution of the property here involved passed to the Western Province, Community of St. Mary, a Wisconsin corporation.

Upon the death of Belle Ogden, the successor trustees of the estate of Frances A. Horsman brought this action in the circuit court of Winnebago County for a construction of the distributive provisions of the testamentary trust established by the will of Frances Horsman. The trial court entered a decree finding that the heirs of Frances Horsman were to be determined at her death; that at that time, Mary Alice Underwood and Belle Ogden were her sole heirs; that Belle Ogden "as one of the heirs at law of said decedent, was not entitled to take any fee of the reversion or the remainder interest in said trust;" and that the entire trust fund should, under the will of Mary Alice Underwood, be paid over to the Horsman Memorial Fund. Western Province, claiming under the will of Belle Ogden, has appealed from ·that decree. A freehold is involved, and this court has direct appellate jurisdiction.

Thus the question for determination is the meaning of the phrase "my heirs at law" in the following clause of the will: "but in case of the death of the said Belle C. Ogden

\* \* \* without a living child or children, then and in that event, to pay and make over to my heirs at law all that shall remain of said trust estáte." It is the position of the appellant that since there is no language in the will which limits the meaning of the word heirs, that word must be given its ordinary meaning, which, in this case, includes Mary A. Underwood and Belle Ogden. Under this construction, one half of the trust estate would pass under the will of Mary A. Underwood, and one half under the will of Belle Ogden. The appellees, who claim the entire trust estate under the will of Mary A. Underwood, assert that the phrase "to my heirs" means "to Mary A. Underwood", or "to my heirs, to the exclusion of Belle Ogden." It is their position that the intention of the testatrix that the phrase should be so construed appears (1) from the family circumstances that preceded, coincided with and followed the execution of the will and the death of the testatrix, and (2) from other provisions of the will which show that intent.

Most of the cases that have involved similar problems have turned upon the time when the heirs of the testator were to be determined:—at the death of the testator, or at the termination of the intervening estate. (See, *e.g., Barnhart* v. *Barnhart,* 415 Ill. 303; *Le Sourd* v. *Leinweber,* 412 Ill. 100; *Himmel* v. *Himmel,* 294 Ill. 557.) In this case, however, the trial court found that the phrase "to my heirs" meant to those persons who were the heirs at law of the testatrix at the time of her death. Both the appellant and the appellees have acquiesced in the determination, and it is not challenged in this court.

As a general proposition, a beneficiary under a will is not barred from taking, as an heir, property as to which the testamentary disposition has failed, even though the gift that failed was to him. As was stated in *Kellett* v. *Shepard,* 139 Ill. 443, 444: "Gifts to a class following a bequest of the same property for life, vest immediately upon the death of the testator. Nor does it make any difference that the

person to whom such previous life interest was given is also a member of the class to take on his death." The most dramatic cases occur when the life tenant, upon whose death without issue the remainder interest becomes effective, is also the sole heir. *Himmel v. Himmel,* 294 Ill. 557, was such a case, and this court there said: "It is the established law of this State that where a life estate is devised to one of several heirs-at-law of the testator with remainder to his heirs-at-law, the life tenant is included within the term 'heirs-at-law' and is included in the devise of the remainder." (294 Ill. at 561.) The appellees do not dispute this general proposition, and we turn therefore to the circumstances that are said to call for a different result in this case.

The appellees first emphasize that the Horsman family was one of substantial means and prominence in the city of Rockford, and they point to the provisions of the wills of Charles I. Horsman and Mary A. Underwood as indicating a strong concern for maintaining the property in the Horsman line. Charles I. Horsman was the husband of Frances A. Horsman. By his will he left all of his property to her, if she survived him. If she did not, his will provided the same scheme of distribution that was later included in his wife's will, except that at the critical point here in issue his will used the phrase "my next of kin" instead of the phrase "my heirs at law." The will of Mary A. Underwood left her property in trust for her son during his life, and upon his death to his children in fee, but if he should die without children then to a charitable trust to be known as "The Horsman Memorial Fund."

In these circumstances we see no unusual features that are of value in construing the will of Frances A. Horsman. The wealth and social prominence of the Horsman family is irrelevant. The asserted concern of Charles I. Horsman that the Horsman property should "follow in the Horsman line" would not be unusual if it existed. That he felt any such

concern is not readily apparent, however, for at a time when he had a living child and two living grandchildren he left all of his property to his wife if she survived him, thus enabling her to dispose of it to the exclusion of his children and grandchildren. The will of Mary A. Underwood was executed in 1923, and its provisions cast no light upon the intentions of her mother, Frances A. Horsman, who died in 1889.

With respect to the provisions of the will itself, the appellees first emphasize that if Belle Ogden married and had a living child or children the corpus of the trust was to be paid to her, but if she died without a living child or children the corpus was to be paid over to *"my heirs at law,"* while in case of Belle Ogden's death before the trust estate was made over to her, "leaving a child or children her surviving then said trust estate shall go to *such child or children as her heirs at law."*

Based upon these provisions of the will the appellees argue: "Doesn't Frances Horsman tell us by this last clause whom she intended to designate by the phrase 'my heirs at law'? She says that if Belle died without a living child, the corpus should then go to 'my heirs at law'; in the very next clause of the same sentence she says if Belle dies before the trust can be made over to her, then the corpus should go 'to such child or children as *her heirs at law'.*

"If Frances Horsman regarded the child or children of Belle as Belle's heirs at law, then when Frances Horsman used the phrase 'my heirs at law' in the same sentence, it seems inescapable that she was referring to 'my children who survive me, viz. Mary A. Underwood'."

We do not find this argument persuasive. If by the phrase "to my heirs" the testatrix meant "to Mary A. Underwood", it would have been easy to say so. The fact that she used the phrase "to such child or children as her heirs at law" when she wanted the property to go specifically to Belle Ogden's children, and not to anyone else, rather in-

dicates that the testatrix knew the difference between the two phrases. We do not find in the testatrix's deliberate choice of different words to deal with different situations, any such inconsistency as would "make it perfectly clear that the word 'heirs' was not used in its proper legal sense" in the clause here in question. *Richardson* v. *Roney,* 382 Ill. 528, 535.

The appellees also assert that there is an important difference between the provisions of the will in this case and the provisions of the wills involved in the many cases that militate against their position. In *Le Sourd* v. *Leinweber,* 412 Ill. 100, 105, for example, the following propositions are stated: "A devise of a future interest to the testator's 'heirs' is construed as a devise to such persons as are his heirs at the time of his death, unless the intention of the testator to refer to those who would have been his heirs had he died at a subsequent time is clearly manifest by the language used in the will. This construction is not changed by the fact that a life estate may precede the devise to the testator's heirs. Neither does it make any difference whether the heirs were living or dead when the period of distribution arrived, nor that the life tenant might be the sole heir of the testator. *Hull* v. *Adams,* 399 Ill. 347; *Himmel* v. *Himmel,* 294 Ill. 557."

The appellees point out that the *Le Sourd* case and others involved a gift over to the testator's heirs upon the death of a life tenant, and that in those cases, therefore, the gift over could not take effect prior to the death of the life tenant. In the present case, however, there was a gift over in fee to the life tenant during her lifetime if she should have a living child. Appellees emphasize the fact that "In the present case there is an intent expressed that the life tenant should be given enjoyment of the fee and power of disposition of the fee, but *only if she should have had a living child.*"

The difference in the two types of bequest which the ap-

pellees thus emphasize does not seem significant to us. In the one case, the life tenant, for whom no specific provision beyond a life estate was made, receives a fee under the testator's ultimate disposition of the property to his heirs. In the other case, one who was to take a fee upon the happening of a specific contingency, receives a fee under the testator's ultimate disposition of the property to his heirs, even though the contingency has not occurred. In comparable situations that arise in connection with lapsed legacies and residuary clauses, the distinction sought to be drawn by the appellees has not been taken. "If a specific devise includes only a partial or a contingent interest, or if an estate in fee is devised specifically but is to take effect only on the happening of some contingent event, the reversion will pass by a residuary clause in the same will although the devisee of the partial or contingent interest is also the residuary devisee. *Ryan v. Beshk,* 339 Ill. 45; *Fisher* v. *Easton, 2*99 id. 293; *Friedman* v. *Friedman,* 283 id. 383; 1 Jarman on Wills, (5th ed.) 650." *Hartwick* v. *Heberling,* 364 Ill. 523, 534. See Annotation, 108 A.L.R. 464.

There is a seeming incongruity in the life-estate cases, in that the very event which terminates the only interest of the devisee that was specifically created by the will gives rise to a greater interest as an heir of the testator. There is the same kind of seeming incongruity in the present case when the very contingency that caused the specific devise of a fee interest to fail gives rise to a fee interest as an heir of the testator. The incongruity is no greater in the one case than the other. In this case, the interest that Belle Ogden takes as an heir is a half interest in the trust estate, while under the specific devise she would have received the entire trust estate.

The problem in cases of this kind stems largely from the effort that is made, after the fact, to analyze the word "heirs" as though it had been intended by the testator to particularize specific takers. But in the context of a con-

cluding disposition of his property a testator ordinarily does not use the word "heirs" to describe specific persons. Rather, as was pointed out by Mr. Justice Holmes, such an ultimate limitation "implies that the testator has exhausted his specific wishes by the previous limitations, and is content thereafter to let the law take its course." *Whall* v. *Converse* 146 Mass. 345 (1888) 15 N.E. 660, 662; see *Himmel* v. *Himmel*, 294 Ill. at 565, 566.

We are of the opinion that in this case the testatrix did not affirmatively intend either to include or exclude Belle Ogden as one of her heirs at law. Rather she had exhausted her specific wishes and was "content thereafter to let the law take its course." There is nothing either in the will or in the other circumstances of the case to dictate a different result. The will appears to have been drafted by an experienced attorney who knew both the meaning and effect of the word "heir." Belle Ogden was one of the heirs of the testatrix at her death, and it was error for the trial court to exclude her.

The decree is reversed and the cause is remanded to the circuit court of Winnebago County with directions to enter a decree consistent with the views expressed in this opinion.

*Reversed and remanded, with directions.*